Certified Translation
Janis Palma, USCCI

IN THE SUPREME COURT OF PUERTO RICO

Janet Santana et als

    Plaintiffs

       v.

Governor Sila María Calderón et als

    Defendants

No. CT-2004-2

Opinion from the Court by Associate Justice Madam Rodríguez-Rodríguez

[initials on the left margin of every page]

San Juan, Puerto Rico, on June 17, 2005.

The United Status District Court for the District of Puerto Rico comes before us by means of a certification procedure and poses the following question for us: Does the Governor of the Commonwealth of Puerto Rico have the authority, under the Constitution of Puerto Rico, to remove the Executive Director of the Human Resources and Occupational Development Council?"[1]

---

[1] The original text of the question certified states: "Does the Governor of Puerto Rico have the authority under the Constitution of Puerto Rico to remove the Executive Director of the HRODC?"

CT-2004-2                                                          2

Before discussing the matter brought before us, we must summarize the facts in the case as they were presented to us by the District Court in its request for certification and the documents attached thereto.

I

A.

Mrs. Janet Santana began her public service with the Commonwealth government in the year 1994, when she started to work at the Department of Education. She subsequently went on to work at the Office of the Governor where she worked as an Assistant in charge of Federal Affairs. She worked there from January 1997 to July 2000, when she was nominated [sic] by then-Governor of Puerto Rico, the Hon. Pedro J. Rosselló-González, to fill the position of Executive Director for the Occupational Development and Human Resources Council (the "Occupational Development Council" or the "Council") for a term of four years, as provided for in Art. 5 of P.L. No. 97 of December 18, 1991, as amended, 18 L.P.R.A. Sec. 1584.

In May 2000, then-Governor Rosselló-González promulgated Executive Order 2000-06 designating the Occupational Development Council as the depository and

administrator of the funds assigned to Puerto Rico for the Workforce Investment Act(WIA)[2],

---

CT-2004-2                                                             3

P.L. No. 105-220, 112 Stat. 946 (1998), 29 U.S.C. secs. 2801-2945 (2002). WIA funds amounted to $300 million dollars, which were then to be administered by the Occupational Development Council.

On January 2, 2001 and after the general elections held in Puerto Rico on November 2000, the Hon. Sila M. Calderón took office as Governor of Puerto Rico. Governor Calderón designated mister Víctor Rivera-Hernández as Secretary of the Labor Department. The latter also took office on January 2, 2001.

On January 3, 2001 the Governor promulgated the Executive Order 2001-03 as a control measure for public expenditures and to foster governmental fiscal stability in view of what was estimated to be a budget in deficit for that fiscal year. Thus, the Executive order provided that

---

[2] In 1998 Congress enacted the Workforce Investment Act (WIA) to promote investments in the workforce that would further employment and employment retention among the beneficiaries. This federal law also seeks to improve occupational training for participants as a mechanism to reduce unemployment. 29 U.S.C. sec. 2811 (2002). In order to receive WIA funds, the state, including the Commonwealth of Puerto Rico, must create a government entity that formulates a strategic plan to invest those funds such that they benefit the labor force. To that effect, the Executive Order 2000-06 created the State Board.

Certified Translation
Janis Palma, USCCI

all career service positions that were vacant at that time were to remain vacant. It further provided that prior authorization would be required from the Chief-of-Staff when it became

---

CT-2004-2                                                    4

necessary to fill some of the existing vacancies within the Commonwealth agencies. Furthermore, the Order required prior authorization form the Chief-of-Staff whenever a contract for consulting or professional services was to be awarded or amended. Executive Order 2001-03 was addressed to "any board, body . . . commission, public corporation, department . . . authority . . . or any instrumentality of the Commonwealth's Executive Branch."

The lawsuit filed alleges that upon mister Rivera Hernández's appointment and after he took office as Secretary of Labor, Mrs. Santana began to experience discriminatory actions against her that culminated in her removal as Executive Director of the Occupational Development Council. It is argued that such actions were motivated by her political affiliation to the New Progressive Party.

Certified Translation
Janis Palma, USCCI

The removal letter sent by the Governor to Mrs. Santana, dated March 7, 2001, said the following:

> You are the Executive Director of the Occupational Development and Human Resources Council ('ODHRC'). As such, you participate in the operation and direction of occupational development and human resources for the Commonwealth of Puerto Rico which involves, among other things, the implementation of programs to develop investment in Puerto Rico's labor force. Your duties, therefore, are purely of an executive nature.

CT-2004-2                                                              5

. . .

> [Y]ou have engaged in some actions that denote insubordination and noncompliance with the Executive order OE-2001-03 and orders [sic] and directives by the Labor Secretary, Hon. Victor [sic] Rivera-Hernández, as is your duty by law. The following among the findings of noncompliance and insubordination: (1) you made three appointments without my authorization, the Chief of Staff's, or the Labor Secretary's; (2) you made a trip to California on official business without notice to and approval from the Labor Secretary; (3) you made an announcement to the Council staff about a reorganization in the career position Classification Plan without the consent of the Labor Secretary; (4) you authorized five purchase orders (sic) for equipment between January 22 and February 9, 2001; and (5) you caused the return of $1,476,070.81 in federal funds under Title III and this turned out to be an incorrect decision since those funds were necessary for matters related to the closing down of companies.

This being the case, in May 2001 Mrs. Santana and her husband filed an action before the United States District

Court for the District of Puerto Rico for political discrimination under the federal civil rights act, 42 U.S.C. sec. 1983. In that action they claimed compensatory and punitive damages, and the issuance of an injunction remedy. The action was filed against the Governor, the Secretary of labor, the Council Director, Xavier González-Calderón, and the Region II Representative for the U.S. Department of Labor, mister Ralph Muñiz, in their personal and official capacities.

The action filed contains three principal claims under the federal civil rights laws, to wit: a claim for

CT-2004-2                                                          6

First Amendment violations based on violations due to political affiliation; a claim for violations to the due process clause of the procedural aspects contained in the Fourteenth Amendment to the United States Constitution, on the grounds that Mrs. Santana had a proprietary interest in her employment; and a third claim in which it was argued that the defendants conspired with each other to remove her from her position.[3]

---

[3] The plaintiffs also included a claim for violations to P.L. No. 100 of June 30, 1959, as amended, 29 L.P.R.A. secs. 146 *et seq.*, for discrimination; a claim for damages under Article 1802 and 1803 of the Civil Code, L.P.R.A. secs. 5141, 5142; a claim directly under the United States Constitution for discrimination

Certified Translation
Janis Palma, USCCI

In response to the complaint filed, the defendants, in their personal capacity, filed a motion to dismiss mainly on the grounds of qualified immunity. In their motion they requested the dismissal of the case on the grounds that, first, Mrs. Santana's removal did not violate her First Amendment rights inasmuch as the position she held was one that implemented public policy, therefore the political affiliation requirement for such a position was appropriate. Second, her due process had not been violated inasmuch as she did not have any proprietary right over

CT-2004-2                                                    7

the position she held. Third, the necessary requirements to establish a cause of action for conspiracy under the federal civil rights statute were not met. Finally, defendants raised the defense of qualified immunity, therefore asked for the dismissal of the complaint filed against them in their personal capacity.

On February 14, 2002 the District Court rendered an opinion in which it agreed with some of the plaintiffs' arguments, thus dismissing the action for political

("Bivens claim") and, finally a cause of action for violation to the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), Pub. L. No. 99-272, 100 Stat. 228, 29 U.S.C. secs. 1162, *et seq.*

discrimination under the First Amendment and the cause of action for conspiracy under 42 U.S.C. sec. 1985(3). *Santana v. Calderón*, 188 F. Supp. 160 (D.P.R. 2002). The District Court denied the motion to dismiss on the cause of action for alleged violation to due process in its procedural aspect.

The defendants were not satisfied with the decision and filed an interlocutory appeal before the U.S. Court of Appeals for the First Circuit. The appeal challenges the lower court's decision *a quo* denying the dismissal of the claim for a due process violation in its procedural aspect. The Court of Appeals reversed the District Court and ruled that, indeed, the defendants were protected by the qualified immunity doctrine regarding the claim under the

CT-2004-2                                                              8

due process clause in its procedural aspect. See *Santana v. Calderón*, 342 F.3d 18 (1st Cir. 2003).

The appeals court concluded that the time of the events that gave rise to the claim by Mrs. Santana, it was not clearly established that the latter had a proprietary right over the position she held, that dismissing the claim

against defendants in the their personal capacity was warranted. The Court of Appeals, reasoning by analogy, and applying the Supreme Court's jurisprudence on the President's power to remove Executive Branch functionaries, concluded that the Governor could very well have the constitutional authority to remove Mrs. Santana as the Council's Executive Director. Acknowledging that this has not been resolved by this Court, it concluded that it was not clearly established that such a course of action was or was not appropriate, which allowed for the defendants to be protected by the qualified immunity when removing her from her position.[4]

CT-2004-2                                                                        9

The Court of Appeals remanded the case to the trial court to go forward with the proceedings as to the other claims included in the complaint filed. The Court invited the lower court to consult with the parties as to the

---

[4] On this particular matter, the United States Court of Appeals for the First Circuit stated the following in *Santana v. Calderón*, 342 F.3d 18 (1st Cir. 2003):

> We cannot conclude that the defendants had notice that their removal of the plaintiff from her position would violate clearly established law. Given the purely executive nature of the Executive Director position, the position's limited policy making function, and the Governor's general power of removal, it was reasonable for defendants to believe that Santana did not have a property interest in continued employment and that her termination therefore was not subject to constitutional due process violation.

Certified Translation
Janis Palma, USCCI

desirability of certifying the controversy before this Court as to the existence or nonexistence of a proprietary right over the position of Occupational Development Council Executive Director. The forum specifically stated: "Only the Supreme Court of Puerto Rico can definitely resolve this property right issue. Therefore, we urge the district court, as it proceeds with the suit for injunctive relief and the other claims against the defendants, to consult with the parties about the appropriateness of certifying to the Puerto Rico Supreme Court the Commonwealth constitutional issue relating to the removal power of the Governor." 342 F.3d, page 31.

That being the situation, this past September 2, 2004 the District Court filed with the Clerk of this Court a petition for certification issued by the Hon. Judge Jaime Pieras before whom the case at bar is being heard. Having accepted the inter-jurisdictional certification presented, we granted both sides a simultaneous term to submit their respective briefs. The

CT-2004-2                                                                    10

parties appeared and being in a position to resolve we proceed to do so.

Before we discuss the legal controversy as such that this appeal raises, we must describe more carefully the powers given by law to the Occupational Development Council's Executive Director given that, as discussed further below, this bears directly on the question certified.

B.

The Executive Director of the Occupational Development Council is the functionary who directs the Council's administrative and operational work. 18 L.P.R.A. sec. 1584. It is a position created by virtue of Public Law No. 97 of December 18, 1991, which is filled for a fixed term of four years and whose salary is established by the Governor. Id.[5] The law does not provide for the removal of this functionary.

The Occupational Development Council is composed by the Secretary of Education, the Secretary of the Family, the Secretary of Economic Development, the Secretary of

---

[5] This functionary is not one in career service pursuant to the Commonwealth Public Service Personnel Act. 3 L.P.R.A. sec. 1301.

Labor – who presides over it –, three representatives of the private sector and three from the public interest. 18 L.P.R.A. sec. 1584. The Council was the

---

CT-2004-2                                                    11

mechanism designed by the legislators to administer and govern the Technological-Occupational Training System for the Commonwealth of Puerto Rico. 18 L.P.R.A. sec. 1584. The System groups the "set of agencies, programs or operational units that directly or indirectly offer services related to the non-university technological occupational training." 18 L.P.R.A. sec. 1582. Technological occupation training is "the formal systematic process to provide each participant with the knowledge and experience to develop the competencies that will enable him or her to get a job, retain it and improve his or her conditions at work." 18 L.P.R.A. sec. 1581(b).

The Executive Director and the Occupational Development Council are in charge of performing the following functions, among others: (1) "**[i]mplement[ing] and enforcing the public policy that is established through this legislation and any other that in the future may be**

Certified Translation
Janis Palma, USCCI

enacted in relation to technico-occupational education and the purposes of this chapter"; (2) establish[ing] the objectives of the System "according to the public policy established."; (3) establishing the minimum competency levels the System students should have; (4) establishing the necessary rules for the "consolidation of two or more technological or occupational programs in the System"; (5) submitting the budgetary request

---

CT-2004-2                                                        12

for the System components to the Office of Budget and Management; (6) being the depository and managing the funds Puerto Rico receives under the federal Carl D. Perkins Applied Vocational and Technological Education law. 18 L.P.R.A. secs. 1585(a), (b), (e), (g), (k), (w). (Emphasis ours.)

In addition, as we stated in the beginning, by virtue of the Executive Order 2000-06, the Occupational Development Council is the depository and administrator of the WIA funds that Puerto Rico receives from the federal government, which amount to $300 million dollars.[6] The

---

[6] Executive Order 2000-06 states as follows:
    "The Executive Director of the Occupational Development and Human resource Council shall be responsible and accountable to the State Board for the receipt, custody and

Council's Executive Director must audit the local and regional boards that receive these funds to ensure compliance with the applicable state and federal regulations. See, Second Amended Complaint, par. 4.9. The Executive Director further participates in the evaluation of proposals submitted to receive these funds and in the eventual authorization of the respective disbursements. *Id.*

   With this background, let us move on, then, to the evaluation of the controversy regarding the constitutional power that the Governor may have to remove functionaries appointed by him. [sic]

---

CT-2004-2                                                    13

First we will offer a brief overview of the certification mechanism and its importance. Then, a historical overview of the removal powers a governor had prior to the adoption of the Constitution, to finely analyze the controversy certified within the context of the scope of the appointments clause in the Constitution. Let us take a careful look.

---

disbursement of the federal funds received pursuant to WIA and shall post fidelity bond prescribed by the laws of Puerto Rico for public employees."

C:\Documents and Settings\administrator\Desktop\Santana_v_Calderon[2].doc; Created by Janis Palma; Created on 12/08/2005 10:38:00 AM; Last printed 12/09/2005 2:15:00 PM

II

The Puerto Rican civil procedural system acknowledges two types of certifications, the intra-judicial and the inter-jurisdictional. The case at bar involves the inter-jurisdictional certification, which is regulated by Art. 3.002(f) of Public law No. 201 of August 22, 2003, 4 L.P.R.A. sec. 24s(f), Rule 53.1(f) of the Rules of Civil Procedure, and Rule 25 of the Rules of the Supreme Court.

Inter-jurisdictional certification is an effective procedural mechanism that allows for the mitigation of tensions inherent to a federalist system where two sovereign judicial systems coexist within the same jurisdiction, the federal system and the state system. Through certification one of those sovereigns seeks the assistance of the second one so the latter makes a definitive pronouncement on a doubtful issue of law, thus announcing a new legal principle. Nash, Examining the Power of Federal Courts to Certify Questions

CT-2004-2                                                    14

of State Law, *88 Cornell L. Rev.* 1672, 1690 (2003);

Calabresi, Federal and State Courts: restoring a Workable

Balance, *78 N.Y.U.L. Rev.* 1293 (2003).

This procedure furthers the interests of both the
federal judicial system and the state judicial system. In
*Arizonians for Official English v. Arizona*, 520 U.S. 43, 76
(1997) (Ginsburg, J.), the Supreme Court stated the
following regarding the benefits derived by the federal
system from the correct use of the certification procedure:
"[Certification] allows a federal court faced with a novel
state-law question to put that question directly to the
State's highest court, reducing the delay, cutting costs,
and increasing the assurance of gaining an authoritative
response." See, Braun, A Certification Rule for California,
*36 Santa Clara L. Rev.* 935, 940 (1996) ("from a federal
court's point of view, allowing certification of an
uncertain point of state law avoids both the necessity of
time-consuming speculation on the unfamiliar law of a
foreign jurisdiction and the possibility of . . . error.")
In the same sense, Kaye, Weissman, Interactive Judicial
Federalism: Certified Questions in New York, *69 Fordham L.
Rev.* 373, 378 (2000); Sloviter, A Federal Judge Views

Diversity Jurisdiction Through the Lens of Federalism, *78 Van. L. Rev.* 1671, 1679-80 (1992); Carr, Robbins, Interjurisdictional Certification and Choice of Law, *41 Vand. L. Rev.* 411, 415 n. 11 (1988).

---

CT-2004-2                                                              15

Therefore, efficiency considerations in case processing, judicial certainty, comity and deference to the highest state court are some of the considerations that drive the use of the certification mechanism by the federal court.

From the state court's point of view, inter-jurisdictional certification is also a mechanism of great use and benefit. In *Pan Ame. Comp. Corp. v. Data Gen. Corp.*, 112 D.P.R. 780, 785 (1982), we stated that this mechanism allows for the "preservation and respect of the of state courts' pristine function of interpreting and formulating the state's laws." See also, *Guzmán Vargas v. Calderón*, res. Of March 23, 2005, ___ D.P.R. ___, 2005. JTS 38. This way the prerogatives of a state to establish, define, and outline the boundaries of its laws are safeguarded. This propitiates and furthers a harmonious judicial interrelation as well as one of mutual respect

between the two sovereign judicial systems living side-by-side within the Commonwealth.


III

The Commonwealth Constitution does not contain an express provision establishing the power of the Governor to remove public functionaries. The sole removal mechanism contained in the Constitution is impeachment. Art. III, sec. 21, Constitution of the Commonwealth of Puerto Rico.


CT-2004-2                                                        16

Now then, historically a Chief Executive's power to remove or sever a functionary from his or her position had been recognized since the early 20th Century when the Political Code was approved in 1902. Article 53 of the 1902 Political Code so provided when it listed among the governor's prerogatives that he was empowered to "sever any functionary he may have appointed; may declare the position vacant and fill it in the manner prescribed by law."[7] 3 L.P.R.A. sec. 6. Therefore, for over a century our system has contained a general law acknowledging this Chief

---

[7] After the approval of the Constitution for the Commonwealth of Puerto Rico, Art. 53 of the Political Code was amended to fit it into the new government system. The change did not alter the power contained therein, at all; its language remained intact.

Executive's prerogative, subject to this happening "in the manner prescribed by law". Therefore, although Art. 53 acknowledged the power to remove it conditioned it to the restrictions prescribed by law.

On the other hand, in *Gelpí v. Leahy*, 56 D.P.R. 925, 926 (1940), when interpreting Art. 49 of the Organic Act of 1917[8] which empowered the Governor to appoint judges, we said: "That article, . . . , grants the Governor **the absolute power to**

---

CT-2004-2                                                              17

**remove as inherent to the power to appoint."** (Emphasis added.)

Thus we see how, at the time our Constitution was adopted, there was already a statutory and jurisprudential standard in Puerto Rico that recognized as inherent to the Governor's power to appoint, the concomitant power to remove; a power that we described in *Gelpí* as absolute.

Let us analyze, then, the text of the Constitution of the Commonwealth of Puerto Rico.

---

[8] Art. 49 of the Organic Act of 1917 provided:
"Hereinafter all judges, marshals and clerks of court currently established or established hereinafter in Puerto Rico and whose appointment by the President is not provided for by law, shall be appointed by the Governor with the advise and consent of the Senate of Puerto Rico."

Certified Translation
Janis Palma, USCCI

B

Upon adopting the Constitution in 1952 the members of the Constitutional Assembly sought to create a government structure consisting of three equal powers, all of them subordinate to the people's sovereignty. Art. I, sec. 2, Commonwealth Constitution. Each one of those powers, although sovereign and independent regarding the exercise of the power conferred, is interrelated to the others while keeping each one's authority whole. *Pueblo v. Santiago Feliciano*, 139 D.P.R. 361, 420 (1995). As Associate Justice Jackson so aptly pointed out in his concurrent opinion in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952): "While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon the branches separateness but interdependence, autonomy but reciprocity."

CT-2004-2                                                    18

The doctrine of the separation of powers is grounded precisely on the principle of power being delegated to the three branches of government so as to "avoid the

concentration of powers in a single branch, or the abuse of power by another one." *Santiago Feliciano*, supra. The existence of three equal powers necessarily generates tension and friction among the branches that is reduced through a checks and balances system that allows for the calibration of a fine equilibrium in the exercise of such power, as ordered by the Constitution. See, *Hernández Agosto v. López Nieves*, 114 D.P.R. 601 (1983); *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407 (1982); *Banco Popular v. Corte*, 63 D.P.R. 66 (1947).

Art. IV of the Constitution describes the scope of the Executive Branch. Section 1, Art. IV, provided specifically that the Executive power was to be exercised by the Governor. On the other hand, section 4, Art. IV provides that the Governor may "appoint, in the manner provided for in this Constitution or by law, all functionaries so authorized to appoint."

During the debate process at the Constitutional Assembly regarding the Executive Branch, delegate mister Gutiérrez-Franqui proposed the elimination of a section from this Article that granted the Governor the following power: "Exercise the general direction of the public administration." Delegate Gutiérrez-Franqui

Certified Translation
Janis Palma, USCCI

CT-2004-2                                                              19

objected to that language since he understood it constituted a limitation of the Governor's constitutional powers. Mister delegate Gutiérrez-Franqui said:

> Then reading this article in the manner in which it was approved by the Full Commission, we thought that inserting this statement: 'exercise the general direction of the executive branch of government' could seem to be a limitation to section 1 where it says that 'the executive power' . . . as is, 'shall be exercised by a governor'.

> If we say here that his attribution and function is to supervise, the general direction, **that is not being the supreme chief of the executive branch, in our judgment, but it is rather a limitation to that power.**

> We understood that the way to correct the possible doubt was to eliminate that phrase in its entirety with this explanation as the purpose for the amendment, **so it would be clear from this Convention's action that it had been its purpose to invest this executive functionary, this chief executive, with the supreme power and the authority within the executive branch, without limitations of any sort.**

3 Diary of Session, 1962, page 2272. (Emphasis added.) See also, J. Trías Monge, *Historia Constitucional de Puerto Rico*, Ed. Universidad de Puerto Rico, 1982, Vol. III, pp. 114-17.

Our Constitution, therefore, adopted a unitary Executive Branch by vesting on a single functionary – the Governor – the supreme authority within the Executive

Branch "with no limitations of any sort." This endows the Executive Branch with a certain dynamism and unity of purpose; it strengthens the Chief Executive in the protection of its constitutional prerogatives when faced with any

---

CT-2004-2                                                        20

attempt by the other branches to undermine them; and it makes him the only one accountable to the citizens for the work of one of the three branches of government.[9]

Vesting the governor with the supreme power and authority within the Executive Branch "with no limitations of any sort" requires, for that statement to have true content, that as minimum the Chief Executive has the legal authority to give instructions or orders of a mandatory nature for the Executive branch functionaries he or she appoints, so that measures are taken that in his or her judgment further the government's public policy.[10] This, in turn, assumes that the Governor has the power to remove that functionary if he or she refuses to act according to

---

[9] On this particular matter see Calabresi, Some Normative Arguments for the Unitary Executive, *48 Ark. L. Rev. 23*, 37-47 (1995); Currie, The Distribution of Power after Bowsher, *1986 Sup. Ct. Rev. 19*, 31-36.

[10] Of course, the action demanded of the functionary has to be framed within his discretional attributions. See, Miller, Independent Agencies, *1986 Supreme Court Review 41*, 59.

what is the public policy stated by the Governor. Only in this way may the Chief Executive be certain that the established public policy is carried out and that there is compliance with the law. Ultimately, the power to remove is equivalent to the power to control the actions of the functionaries within the Executive that formulate or contribute to formulating public policy.[11]

CT-2004-2                                                           21

On the other hand, section 4 of Art. IV of the Constitution lists the Governor's constitutional duties, functions and attributions, among which is the obligation to "obey and enforce the laws". In order to comply with this constitutional obligation, the Governor has to appoint functionaries that may assist him with this task. Evidently it is not possible for such a responsibility to fall exclusively on one person.

The essence of the concept of enforcing the law "is not the mere interpretation and implementation of the legislative mandate, but it is to ascertain **who exercises the final authority on the officers that implement the**

---

[11] See, Calabresi, Normative Arguments for the Unitary Executive, *48 Ark. L. Rev. 23*, 58 (1995).

Certified Translation                                                      Page 25 of 50
Janis Palma, USCCI

law". *Noriega v. Hernández Colón*, 112 D.P.R. 406, 463 (1994). (Emphasis added.) A sequel, then, to the obligation to obey and enforce the law imposed by the Constitution, is the power to exercise "the final authority over . . . [the] officers" that assist the Governor in the discharge of that responsibility; which necessarily implies the power to remove those who fail to comply with that responsibility.

We must, then, conclude, in light of the assumptions mentioned earlier, that jointly with the constitutional power to appoint that the Chief Executive has, there is a power to remove those who are appointed. See, *In re Marín Báez*, 81 D.P.R. 274, 278 n. 3 (1959). ("The sole alternative left would be to make use of the inherent power

CT-2004-2                                                                22

of the Executive to remove the functionaries he [sic] appoints.") A prerogative that, as we have seen, was not foreign to our system when the Constitution was approved in 1952.

C

The contents and scope of the Governor's power to appoint and his [sic] power to remove subordinate

functionaries is a subject we recently covered also as a result of a petition for certification. *Guzmán Vargas v. Calderón*, supra. We go over it today again.

The discussion that ensued during the Constitution adoption process, specifically as to the powers of the legislative Assembly, are now useful to us as a point of departure, as always, from which to derive the scope of the Governor's powers vis-à-vis the Legislative Assembly's prerogatives.

Art. III of the Constitution on the Legislative Assembly powers contained a language that empowered the Legislative Assembly to "determine the functions, duties, and term of service of the secretaries of government." It also contained another provision stating that: "[n]o secretary of government shall hold office for a period that exceeds the incumbency of the Governor who appointed him or her." The delegate mister Gutiérrez-Franqui proposed that such provisions be eliminated,

Certified Translation
Janis Palma, USCCI

---

CT-2004-2                                                    23

invoking for this the decision by the United States Supreme

Court in *Myers v. United States*, 272 U.S. 52 (1926) and

*Humphrey's Executor v. United States*, 295 U.S. 602 (1935).

These are cases in which the scope of the appointments

clause in the United States Constitution and the

limitations it imposes on the power exercised by Congress

were extensively discussed. Given its relevance to the

controversy now before us, we cite *in extenso*:

> Upon a careful examination of this provision, **we were overtaken by the doubt of whether it was one of the powers of the Legislative Assembly, in a government under a republican system**, and where the legislative Assembly has the power to approve laws above the Governor's veto, **that the legislative branch would have the power to change as its whim the duration term of the positions for government secretaries; or to change at its whim the specifications of their functions.**
>
> In our study of the problem we went looking for the source of the American constitutional law and we first of all found that the Constitution of the United States says nothing about the functions and terms in office for Cabinet member positions. Upon finding this situation in the federal Constitution, we started to look for the history of judicial interpretation that could exist on the matter and we found that the problem was the object of ample consideration and discussion by the federalists and by the first commentators of the American Constitution.
>
> . . .

---

Certified Translation
Janis Palma, USCCI

The first judicial controversy that arises regarding the problem [. . .] is known in the case law [. . .] such as the *Myers* case. The *Myers* case affirmed that the United States Constitution, upon granting the president the power to appoint, **it likewise granted him an indispensable ingredient of that power, the power to remove at any time; and no provision**

CT-2004-2                                                     24

**of the United States Congress could set a fixed term on a functionary of the Executive [branch] that could be valid, against the absolute will of the [chief] executive to remove him or her at any time.**

. . .

This was how the situation reached the courts and it is at that time that the absolute rule is modified in the *Myers* case, and a decision is made to the effect that the United States Constitution, in keeping silent about the term of office for Cabinet member positions, and by not authorizing Congress specifically to legislate on the matter, it had proceeded on the basis of these being positions of such a nature as to belong to the executive branch such that the President's power to appoint and remove from these positions was absolute, and this is what the doctrine in the *Myers* case affirmed.

But the *Humphrey* case did point out that the rule is not such in the case of appointments made by the President that are not, first of all, part of the essence of the executive power itself, or when they are appointments made of people performing functions in one of the other branches of government, be it the legislative branch, the judicial branch, or one of the quasi-judicial bodies. So the power given to the President of the United States by law to appoint a person to the legislative branch has to be governed by all the limitations imposed by law, and if a term of office is imposed, that time period is above the [chief] executive's power to make the

Certified Translation                                                    Page 29 of 50
Janis Palma, USCCI

designation.

If the law grants the President of the United States the power to make an appointment of a judicial nature, or one for a board or body of a quasi-judicial nature, and sets a term to it, then the term is mandatory for the President and he or she cannot dispose of the position without being subject to what the law provides in terms of time frames. **Where the matter is clear in that Congress cannot intervene to set the duration of those positions is in relation to those that, because essentially they belong to the judicial [should say executive] branch, the Constitution did not**

---

CT-2004-2                                                       25

**set a term for them and, consequently, the power to remove was implicit in the power to appoint.**

Mister President and fellow delegates: **the purpose of this amendment I now have the honor to propose is simply for us to adopt a manner in which to handle the matter established by the Constitution of the United States, with the judicial interpretation thereof in the manner that we have presented.**

3 Dairy of Session, pp. 2269-2270.

As we can see, when our Constitution was approved we made ours the analysis model presented in *Myers* and *Humphrey's Executor*, to evaluate under what circumstances the Legislative Assembly can impose restrictions on the Governor to remove functionaries of the Executive. In other words, the decisions in those cases determine **the boundaries of the Governor's power to appoint and his or**

**her power to remove and the limitation that such power necessarily represents for the exercise of the Legislative Assembly's prerogatives.** Certainly, as to those functionaries whose duties are part of the essence itself of the Executive Branch, adopting the decision in *Myers* is consistent with the vision adopted in the Constitution to invest the Governor with all of the Executive power "with no limitations of any sort".

In light of the above, and considering that the Commonwealth Constitution is modeled in broad strokes after the government structured contained in the United States Constitution, it is appropriate for us to go over, in greater detail, the manner in which this subject has been

CT-2004-2                                                          26

treated by the United States Supreme Court, paying special attention to the decisions in *Myers* and *Humphrey's Executor*.

D

The United States Constitution does not assign the President the power to remove federal officials who are his or her subordinates. On the other hand, the appointments

clause of said Constitution, contrary to ours, establishes two types of functionaries that the President can appoint: those known as "principal officials" whose appointments befall exclusively on the Chief Executive, and those known as "inferior officials" who may be appointed by the President, the courts of law, of the heads of departments, as provided by law. Art. II, sec. 2, cl. 2, United States Constitution.

Now then, even when the Constitution remains silent about the President's power to remove, the Supreme Court decided early in its constitutional history that the President's power to remove is incidental to the power to appoint. *Ex parte Hennen*, 38 U.S. (13 Pet) 230, 259 (1839); *Keim v. United States*, 177 U.S. 290, 293-94 (1900); *Shortleff v. United States*, 189 U.S. 311, 314-15 (1903). In addition, it has been ruled that the power to remove is inherent to the power and responsibility

CT-2004-2                                                        27

that the President has to make sure there is faithful compliance with the law. *Myers v. United States*, 272 U.S. 52, 163-64 (1926).

The scope and boundaries of the President's power to appoint and the power of removal were shaped mainly by a trilogy of cases in the Supreme Court, to wit: *Myers, supra*; *Humphrey's Executor, supra*; and *Wiener v. United States*, 375 U.S. 349 (1958).

In *Myers* the Supreme Court ruled that a federal statute providing that Postmasters – appointed for a fixed term of four years – could be removed by the President only "with the advise and consent" of the Senate was unconstitutional. The Court found that Congress could not interfere with the President's constitutional role in the enforcement of laws by limiting his control over executive functionaries appointed to assist him or her in that task. *Myers*, 272 U.S. page 119 ("the President has the exclusive power of removal of executive officers of the United States whom he has appointed and by and with the advise and consent of the Senate.") The Supreme Court concluded its opinion by stating the following:

Certified Translation                                              Page 33 of 50
Janis Palma, USCCI

Our conclusion on the merits, sustained by the arguments before stated, us that **article 2 grants to the President the executive power of the government, i.e., the general administrative control of those executing the laws, including the power of appointment and removal of executive officers, a conclusion confirmed by his obligation to take care that the laws be faithfully executed**; . . . and, finally, that to hold otherwise would make it impossible for the

---

CT-2004-2                                                    28

President, in case of political or other difference with the Senate or Congress, to take care the laws be faithfully executed. (Emphasis added.)

*Myers*, 272 U.S. pp. 163-64. L. Tribe, *American Constitutional law*, Foundation Press, 2000, 3rd ed., page 703. ("*Myers* . . . is the primary source of the modern theory of removal".) Currie, The Distribution of Powers after *Bowsher*, 1986 *Supreme Court Review* 19, 34 ("Congress cannot deprive the President of the Executive Power. . . . Thus the Court was plainly right in *Myers v. United States*, that Congress could not forbid the President to discharge the Postmaster.")

Subsequently, in *Humphrey's Executor*, the Court endorsed a restriction on the President's power to remove Federal Trade Commission (FTC) commissioners. Under the law being challenged, the President could only remove

commissioners for "inefficiency, negligence in the fulfillment of their duties, or mismanagement in the discharge of their duties." 292 U.S. page 619 ("inefficiency, neglect of duty or malfeasance in office.") The Supreme Court reasoned, after analyzing the functions of the FTC commissioners, that these had "quasi legislative" and "quasi judicial" powers, and not functions of an executive nature, as was the case in *Myers*, therefore Congress could validly limit the President's power of removal. The Court stated:

CT-2004-2                                                         29

> **We think it plain under the Constitution that illimitable power of removal is not possessed by the President in respect of officers of the character of those just named.** The Authority of Congress, in creating quasi legislative or quasi judicial agencies, to require them to act in discharge of their duties independently of executive control cannot well be doubted; and that authority includes, as an appropriate incident, power to fix the period during which they shall continue, and to forbid their removal except for cause in the meantime.

*Humphrey's Executor*, 295 U.S. page 629.[12] Therefore, the analysis made in *Humphrey's* is functional in nature, since

_____

[12] The distinction made in *Humphrey's executor v. United States*, 295 U.S. 602 (1935), between executive functionaries *versus* quasi legislative or quasi judicial ones, strengthen the independence of what has been called the Fourth Branch of government ("the Headless Fourth branch"), to wit: the regulatory agencies or commissions, among others, i.e., the "Securities and Exchange Commission", the "Federal trade

the limitations that Congress may impose on the President's power to appoint will be evaluated in light of the functions carried out by the official.

In *Wiener*, the Supreme Court arrived at a similar result to the one in *Humphrey's Executor*, when it endorsed an unjustified dismissal claim by a member of the "War Claims Commission" (the "Commission"), who had been

CT-2004-2                                                                30

removed from his position by President Eisenhower. The Commission's enabling law provided that the commissioner positions were to be held for the time period that the Commission was active and did not provide for the removal of its members. The Supreme Court ruled that the Commission had been created as an adjudicative body and, therefore, the president could not remove its members at his pleasure. 375 U.S. page 345.

A joint analysis of these three cases allows for the extraction of the following principles: First, that the President's power to remove an official whose functions are

---

Commission", the "Federal Reserve Board" and the "Federal Communications Commission". Professor Fried states the following: "The independence of the independent agencies is primarily due to the fact that their members do not – like most officers in the Executive Branch – serve at the pleasure of the President. Rather, under a variety of statutory formulations, they may be removed only for misbehavior." C. Fried, *Order & Law*, Simon and Schuster, 1991, pages 155-56. See also, Miller, *op cit*, pages 64-65.

C:\Documents and Settings\administrator\Desktop\Santana_v_Calderon[2].doc; Created by Janis Palma; Created on 12/08/2005 10:38:00 AM; Last printed 12/09/2005 2:15:00 PM

Certified Translation
Janis Palma, USCCI

purely executive is absolute. The second principle poses that when the functions carried out by the executive functionary partake of the attributes of the legislative or judicial function, Congress does have the authority to condition the removal of that functionary from his or her post, by imposing, for example, the requirement of just cause for the removal.

E.

Our discussion on the scope of the President's power of removal would be short if we did not make reference to the Supreme Court decisions in *Morrison v. Olson*, 487 U.S. 654 (1988); the most recent statement from said Court on the President's power to appoint and remove. Let us see.

CT-2004-2                                                    31

After the Watergate scandal, specifically in response to the incident commonly known as the "Saturday night Massacre", when President Nixon summarily dismissed the Special Prosecutor Archibald Cox, who was investigating the Watergate incidents, Congress approved the "Ethics in Government Act". 28 U.S.C. secs. 591-599 (1994).[13] This

---

[13] The law that created the Independent Prosecutor expired on June 30, 1999 when it was not re-authorized by Congress. Regarding the controversial position of Independent Prosecutor see, Fried, *op. cit.*; Ryan, Consels, Councils and Lunch: preventing Abuse of the Power to Appoint Independent Counsels, 144 *U. Pa.*

law, among other things, created the figure of the Independent Prosecutor, and provided for this functionary to be designated by a special panel of judges established by law, 28 U.S.C. secs. 592(a)(1), (c)(1) (1994) and could only be removed by the Secretary of Justice for just cause or for mental or physical impairment. 28 U.S.C. sec. 596(a)(1) (1994).[14]

---

CT-2004-2                                                           32

The law's constitutionality was challenged in *Morrison*. Upon facing the constitutional controversy, the Supreme Court had to resolve, as a threshold issue, whether the Independent Prosecutor was a "principal official" whose appointment was exclusively the President's prerogative or, on the contrary, he or she was a "inferior official" that

---

*L. Rev.* 2537 (1996); O'Sullivan, The Independent Counsel Statute: Bad Law, Bad Policy, 33 *Am. Crim. L. Rev.* 463 (1996); Martin & Zerhuse, The Independent Counsel, Checks and Balances, 58 *Geo. Wash. L Rev.* 536 (1990).

[14] Under this law, whenever the Secretary of Justice received information about possible criminal acts by high government officials covered by this law, he or she had an obligation to carry out a preliminary investigation. 28 U.S.C. sec. 591(1) (1994). If the preliminary investigation revealed the need to expand on it, then the Secretary had to ask a special panel of judges, created by law and under to the United States Court of Appeals for the D.C. District, to designate an Independent Prosecutor. 28 U.S.C. secs. 592(a)(1), (c)(1) (1994). The special panel then defined the scope of the criminal investigation referred. 28 U.S.C. sec. 593(b)(1) (1994). Once appointed, the Independent Prosecutor had full authority and independence to investigate and accuse. The statute stated that the prosecutor was vested with: "[the] full power and independent authority to exercise all investigative and prosecutorial functions and powers of the Department of Justice, the Attorney General and any other office or employee of the Department of Justice." 28 U.S.C. sec. 594(a) (1994). Once appointed, the Special Prosecutor could only be removed by the Secretary of Justice for just cause or for mental or physical impairment. 28 U.S.C. sec. 596(a)(1) (1994).

could be appointed not only by the President but also by the Judicial Branch.

The Court concluded that the Independent Prosecutor was a "inferior federal official". That was the case based on the analysis of the four criteria, to wit: because he or she could be removed by a high-ranking official of the Executive Branch, as was the Secretary of Justice, 487 U.S. page 671; he or she was only delegated the limited powers of criminal prosecution and did not have the authority to formulate public policy, *Id.,* pages 671-72; his or her jurisdiction was limited to some high-ranking federal functionaries that were alleged to have committed certain crimes of a grave nature, *Id.,* page 672; and the

CT-2004-2                                                                33

term of appointment was limited since it concluded once his or her entrusted task had ended. *Id.*[15]

Having resolved the threshold issue, the Court then went on to analyze whether some other provision in the

---

[15] Professor Tribe, who appeared as a friend of the Court in *Morrison v. Olson*, 487 U.S. 564 (1988), representing the Independent Prosecutor Lawrence Walsh, who was investigating the "Iran-Contra" scandal, severely criticized the Court's conclusion and stated:
> "It seems a stretch, to say the least, to describe as an inferior, rather than principal office of the United States, a government official empowered to embark on a largely unsupervised mission to take down a President."

L. Tribe, *American on Constitutional Law*, Foundation Press, 3rd ed., 2000, sec. 4-8, page 685.

Constitution invalidated the statute challenged because it violated the separation of powers doctrine. To face the separation of powers issue, the Court used the analysis model that demanded an evaluation of "the totality of the circumstances."[16] So it was not only necessary to determine the type of functionary involved (i.e. executive, quasi legislative or quasi judicial) but also how the limitation imposed by Congress on the President had an effect over his or her power to enforce the laws. The Court expressed this analysis model when it said the following about the statute challenged: **"taken as a whole** [it did not] impermissibly [. . .] undermined [. . .] the powers of the Executive Branch [or] disrupt [. . .] the proper balance between the coordinate branches [by]

CT-2004-2                                                                          34

prevent[ing] the Executive Branch from accomplishing its constitutionally assigned functions." *Morrison*, 487 U.S. pages 693, 695. (Emphasis added.)

The Court posed the controversy before them as follows:

---

[16] Professor Tribe describes this analysis as: "the seemingly unprincipled 'totality of the circumstances' test." Tribe, op. cit., page 696.

Certified Translation
Janis Palma, USCCI

"[B]ut the real question is whether the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty and the functions of the officials in question must be analyzed in that light."

487 U.S. page 691. They further pointed out:

We undoubtedly rely on the terms 'quasi-legislative' and 'quasi-judicial' to distinguish the officials involved in *Humphrey's Executor* and *Wiener* from those in *Myers*, but our present considered view is that the determination of whether the Constitution allows Congress to impose a 'good cause' type restriction on the President's power to remove an official cannot be made to turn on whether or not that official is classified as 'purely executive'. **This analysis contained in our removal cases is designed not to define rigid categories of those officials who may or may not be removed at will by the President, but to ensure that Congress does not interfere with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II. *Myers* was undoubtedly correct in its holding, and in its broader suggestion that there are some 'purely executive' official who must be removable by the President at will if he is to be able to accomplish his constitutional role.** (Emphasis added.)

487 U.S. page 689.

Under this analysis model, the Court concluded that the statute did not impermissibly diminish the

Certified Translation                                                    Page 41 of 50
Janis Palma, USCCI

CT-2004-2                                                        35

President's prerogative since, even when the law limited the President's control over the criminal investigations of high-ranking functionaries in government, he retained "sufficient control" over the Independent Prosecutor to discharge his constitutional prerogatives. *Id.,* page 696. Therefore, the "Ethics in Government Act" did not violate the appointments clause or the separation of powers doctrine, as it did not impermissibly interfere with the Chief Executive's powers.

No doubt that *Morrison* reformulates the functional analysis of *Humphrey's Executor* and *Wiener*, as well as having an effect on *Myers*. Under *Morrison*, there will always be a need to analyze how the restriction imposed by Congress bears upon the Chief Executive's obligation to ensure compliance with the laws when dealing with inferior officials, even when these are "purely executive functionaries". The analysis model established in *Morrison* has been broadly criticized in the doctrine.[17]

---

[17] See, among others, Martin, *Morrison v. Olson* and Executive Power, *Tx. L. & Pol.* 511 (2000); Breker-Cooper, The Appointment Clause and the Removal Power: Theory and Séance, 60 *Tenn L. Rev.* 841 (1994); Libberman, *Morrison v. Olson*: A Formalistic Perspective on Why the Court was Wrong, 38 *Am. U.L. Rev.* (1989); Nagel, A Comment on the Rule of Law Model of Separation of Powers, 30 *Wm. & Mary L. Rev.* 355 (1989); Carter, Comment: The Independent Counsel Mess, 102 *Harv. L. Rev.* 105 (1988); Redish, Separation of Powers, Judicial Authority and the Scope of Art. III: The Troubling Cases of *Morrison* and *Mistretta*, 39 *De Paul L. Rev.* 299 (1989); Werhan, Towards and Eclectic Approach to Separation of powers: *Morrison v. Olson* Examined, 16 *Hastings Const. L. Q.* 393 (1989).

Certified Translation
Janis Palma, USCCI

```
CT-2004-2                                          36
```

In *Guzmán Vargas v. Calderón* we adopted the "totality of circumstances" analysis in Morrison to define the interrelation between the Governor's power to appoint and remove in light of the Legislative Assembly's prerogatives.[18] We clarified in *Guzmán Vargas* that the main criterion to analyze whether the provisions of a statute have an effect over the Chief Executive's powers is to evaluate whether the limitation imposed interferes "in an impermissible and unreasonable fashion with . . . [the power of the Governor] to ensure compliance with and implement the laws and to formulate and implement public policy." *Guzmán Vargas*, page 21. We also emphasize that when "purely executive" functionaries are involved "the power of the Legislative Branch to impose requirements is minimal." *Id.*

We now must apply the standard outlined above to the case before us.

Let us see.

---

[18] We should note that in *Guzmán Vargas v. Calderón*, res. March 23, 2005, ___ D.P.R. ___. 2005 JTS 38, we established that the point of departure for the aforementioned analysis is to be an evaluation of "**the degree of independence**, in relation to the Executive Branch, **required** by the functionary in question to efficiently carry out the tasks entrusted to him or her" **in order to then determine whether or not the functionary is "purely executive"** and, therefore, may be freely removed. To that effect, see also: *Wiener v. United States*, 357 U.S. 349, 353 (1958).

Certified Translation
Janis Palma, USCCI

IV

The facts in this case denote with the utmost clarity that the position of Executive Director of the

CT-2004-2                                                    37

Occupational Development Council is strictly an executive one. The Council is a government entity under one of the Executive departments with a constitutional rank just like the Department of Labor. The Executive Director is the functionary created by law to direct the operations of this entity of the Executive Branch. Note, further, that the Council does not partake in legislative or judicial traits; again, its functions are strictly executive in nature.

The Executive Director, as we saw, is appointed by the Governor with the advise and consent of the Senate and his or her salary is determined by the Governor him or herself. This is not a functionary in career service as defined in the Commonwealth Public Service Personnel Act, and therefore does not enjoy the protection that the Law affords career employees.

As we pointed out initially, the Council is a governing body to "implement and enforce" governmental

public policy related to technical-occupational education, and to establish the objectives of the government agencies in order to further that public policy. 18 L.P.R.A. sec. 1585(a), (b). Certainly, then, when directing the Council's operations, the Executive Director not only implements but also participates in the formulation of the government's public policy in a sensitive area for the country's economic development. Therefore,

CT-2004-2                                                                    38

it is imperative for the Governor to be able to exercise an effective supervision over such a functionary and to make sure the law will be interpreted and applied correctly and in accordance with his or her public policy.

On the hand, the functions performed and the control exercised by the Executive Director regarding the disbursements of those federal funds received by the government of Puerto Rico has a direct bearing on matters concerning the Governor, particularly as to the public policy to promote jobs and strengthen economic development. As correctly pointed out by the First Circuit Court of Appeals, on that same aspect:

Certified Translation                                                      Page 45 of 50
Janis Palma, USCCI

"the control over allocation of substantial
federal funds and the power to review the
regional board's proposal for work place
investment **involve policy making on issues of
fundamental concern to the Governor: economic
development, job creation and job training.**"

*Santana v. Calderón*, 342 F.3d. page 21. (Emphasis added.)

Further note that included among the Executive
Director's functions, as we have stated, is that of
auditing local or regional boards that receive WIA funds
to, among other things, verify compliance with the
accounting parameters and the applicable state and federal
regulations for the use of public funds disbursed. As such,
the Executive Director is an essential functional for the
Governor to be able to comply

CT-2004-2                                                            39

with his or her constitutional obligation to obey and
enforce the laws.[19]

Public Law No. 97 provides that this position be held
by a fixed term of four years and does not provide for any

---

[19] On this particular matter, the following is pointed out in *Santana v. Calderón*, 342 F.3d 18, 29 (1st Cir. 2003):

Moreover, the Executive Director's responsibility for the receipt, custody and
disbursement of the federal funds pursuant to WIA, and her duty to audit the regional
boards for accountability and compliance with federal and Commonwealth regulations,
make the position important to the Governor's constitutional obligation to faithfully
execute the laws in these areas of central concern.

C:\Documents and Settings\administrator\Desktop\Santana_v_Calderon[2].doc; Created by Janis Palma; Created on 12/08/2005
10:38:00 AM; Last printed 12/09/2005 2:15:00 PM

Certified Translation                                                                    Page 46 of 50
Janis Palma, USCCI

circumstances under which this functionary may be removed by the Governor. Now then, we have already concluded that the Executive Director is a functionary who performs tasks strictly partaking of the essence of the Executive branch and that he or she implements and, to a lesser degree, formulates public policy in areas of high interest for the government. He [sic] also assists the Governor in the discharge of his or her constitutional responsibility to oversee compliance with the laws. Taking the above into account, we concluded that the term provided for in the law is merely a directive one. That term does not establish a mandatory time period to fill the position and therefore **does not confer upon that functionary a proprietary interest therein. That term does not deprive the Governor, either, of his or her prerogative**

CT-2004-2                                                                                40

**to remove the functionary of the position if he or she deems it necessary and prudent.[20]**

---

[20] In the same sense, in *Santana v. Calderón*, supra, page 29, the United States First Circuit Court of Appeals stated:

> By contrast, if the statute establishing the Executive Director position is interpreted as guaranteeing a four-year term, the Governor's power to assure that the Executive Director is competently performing her responsibilities is severely impaired. Hence, on the limited record before us on interlocutory appeal, it appears that the position of

Otherwise, we would have to conclude that the terms set would keep the Governor from being able to comply with his or her constitutional prerogative to look out for the faithful compliance with the law, as well as furthering the governmental public policy regarding areas inherent to the Executive Branch. That would be unacceptable. The Legislature cannot meddle in areas that have been reserved for other government branches and much less to completely eviscerate a prerogative of another one of the constitutional powers.

Thus we resolve that the Executive Director of the Occupational Development Council, because he or she is a government functionary that exercises strictly executive functions, participates in the formulation and implementation of the Puerto Rico government's public policy in areas of seminal importance, such as: education and technical-occupational training of citizens, job creation and the development and strengthening of the economy; and assists the Governor in the discharge of his or her constitutional obligations to enforce compliance with the laws, **can be freely removed by the Governor.**

---

Executive Director of the HRODC may fall within the Governor's constitutional power of removal under a <u>Morrison</u>-type analysis.

In light of the above, we conclude that the term of four years provided for by Art. 5 of Public Law No. 97 to hold the position of Occupational Development Council Executive Director is merely directive, therefore under the appointments clause of the Constitution of the Commonwealth of Puerto Rico, the Governor is empowered to remove said functionary from the position when he or she deems it necessary and appropriate.

Judgment shall be entered accordingly.


[signature]
Anabelle Rodríguez-Rodríguez
Associate Justice


**CERTIFICATION BY TRANSLATOR**

I, JANIS PALMA, an English-Spanish interpreter and translator certified to that effect by the Administrative Office of the United States Courts and the National Association of Judiciary Interpreters and Translators (NAJIT), do hereby certify that I have translated the foregoing document and it is a true and accurate translation to the best of my knowledge and abilities.

Janis Palma, USCCI                          12/09/2005
                                            Date

Certified Translation
Janis Palma, USCCI

IN THE SUPREME COURT OF PUERTO RICO

| | | |
|---|---|---|
| Janet Santana et als<br><br>Plaintiffs<br><br>v.<br><br>Governor Sila María Calderón et als<br><br>Defendants | No. CT-2004-2 | |

JUDGMENT

San Juan, Puerto Rico, on June 17, 2005.

On the grounds stated in the foregoing Opinion, which is made to form part of this Judgment in its entirety, we conclude that the term of four (4) years provided for in Article 5 of Public Law No. 97, to hold the position of Occupational Development Council Executive Director, is merely directive and, therefore, under the appointments clause of the Constitution of the Commonwealth of Puerto Rico the Governor is empowered to remove said functionary from the position when deemed necessary and appropriate.

Having invoked the Rule of Need, the Court has so ruled and ordered, and is certified by the Clerk of the Supreme Court. Associate Justice Fuster Berlingeri concurs with the result without a written Opinion. Associate Justice mister Rivera-Pérez dissents with a written opinion.

[signature]
Aida Ileana Oquendo-Graulau
Clerk of the Supreme Court

[seal of the Supreme Court]

**CERTIFICATION BY TRANSLATOR**

I, JANIS PALMA, an English-Spanish interpreter and translator certified to that effect by the Administrative Office of the United States Courts and the National Association of Judiciary Interpreters and Translators (NAJIT), do hereby certify that I have translated the foregoing document and it is a true and accurate translation to the best of my knowledge and abilities.

_____          12/09/2005
Janis Palma, USCCI                                       Date